UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FREDERICK WHITE,

    Plaintiff,

v.                                          CASE NO.: 8:09-cv-1533-T-23TBM

VERIZON FLORIDA LLC, and
INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS, LOCAL
UNION 824,

    Defendants.
_____/

**ORDER**

The plaintiff Frederick White sues (Doc. 2) the defendants Verizon Florida LLC ("Verizon") and International Brotherhood of Electrical Workers, Local Union 824 (the "Union"), under the Florida Civil Rights Act (the "FCRA"), Sections 760.01-.11, Florida Statutes; the Florida Private Whistleblower's Act, Sections 448.101-.109, Florida Statutes; and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.. White alleges (1) that Verizon unlawfully terminated him based on his race and (2) that the Union conspired with Verizon to discriminate against him. The defendants remove (Doc. 1), and both Verizon and the Union move (Docs. 58, 60) for summary judgment. White responds (Docs. 90, 91) in opposition.

Background

In 2005, Verizon hired White to work as a local manager[1] under the supervision of an area manager, Kevin Koeberle.[2] As a local manager, White supervised "field technicians" at a Verizon facility located in Brandon, Florida (the "Brandon facility"). In May, 2006, Steve Fortner became White's supervisor and area manager. After White complained about a co-worker's calling White "boy," White requested and received a transfer to the Verizon facility in the Carrollwood community near Tampa, Florida. According to White, others at the Brandon facility would refer to White as "boy" by stating to each other, for example, "you need to get your boy."[3] White (1) believed that the context in which his co-workers used the term "boy" rendered "boy" a "racist term" and (2) informed Fortner that the Brandon facility was "very racially segregated."[4] In

---

[1] March 4, 2010, Deposition of Frederick M. White ("White Depo"), at 26-29.

[2] White Depo. at 26-29, 95; May 27, 2010, Deposition of Kevin Koeberle ("Koeberle Depo"), at 21. White believed (1) that he was a "diversity candidate" for the position at Verizon, because he was the only African-American manager at the Brandon facility and (2) that "other managers felt threatened . . . ." by him. White Depo. at 201-03. Specifically, White stated that "[b]eing an African-American male was a stipulation of my hiring. That was something that me and Kevin Koeberle discussed during the interview process. That was the basis for the hire."

[3] John Glye (a union steward) deposed (Doc. 102-1), in response to an inquiry as to the use of "boy" at the Brandon facility, that:

> I may look over at Mr. Prunn and say, "Hey boy, bring me that. Hey dude, get me that." It's just common chatter amongst the guys maybe, "Dude, boy, what's up?" It's not specific to any race or anything like that, someone saying boy. I've joked with Robert you know and said, "Hey boy, grab that for me. Give me that." You know, it's not specific to any one person. Anybody could do that. So I've heard employees talk like that.

Kenneth Prince, an African-American technician, stated that his co-workers generally addressed a person as "boy" instead of using the person's name. April 2, 2010, Deposition of Kenneth Prince ("Prince Depo"), at 159-62.

[4] White Depo. at 273-76. Another local manager, Charles Gunn, stated that (1) he believes the term "boy" is racist and (2) that he believes that the Brandon facility is a "racist environment." May 21, 2010, Deposition of Charles Gunn ("Gunn Depo"), at 29-30, 45-46. Clyde Lochin also testified as to the racial division at that the Brandon facility. March 2, 2010, Deposition of Clyde Lochin ("Lochin Depo"), at

(continued...)

2007, Koeberle recruited White to return to the Brandon facility.  White believed that the transfer was a promotion, because he received an increased salary and a different title.[5]

At the Brandon facility, White supervised seventeen technicians.[6]  Verizon provides most technicians a van equipped with a global positioning system ("GPS") in order to "track technicians' locations in real time and also re[-]trace technicians' routes."[7]  A local manager (such as White) receives a truck without a GPS system.  Verizon uses the GPS to compile a "SABIT" or productivity report that "shows the technician[']s[] job tickets for the day and [compares] . . . that with [the technician's] GPS information as to where the vehicle drove for the day."[8]  Additionally, the SABIT report "shows data relative to the technician's job tickets, including service location, time started, time closed and coincides with GPS information from the vehicle."[9]  One of White's duties as a local manager consisted of reviewing the SABIT report for each technician whom White supervised.[10]  Verizon follows no procedure for compiling and reviewing the

---

[4](...continued)
57-58.

[5] White Depo. at 204-05.

[6] White Depo. at 95-96.  Neither Clyde Lochin nor Kenneth Prince, former Verizon technicians and the plaintiffs in parallel actions (8:09-cv-1534-T-23TBM and 8:09-cv-1535-T-23TBM) against Verizon and the Union, worked under White's supervision.

[7] Declaration of Carol Chipman ("Chipman Declaration") (Doc. 77).

[8] May 20, 2010, Deposition of Eric Morin, ("Morin Depo") (Doc. 109-1), at 24-26.

[9] Chipman Declaration (Doc. 77).

[10] White Depo. at 102; Chipman Declaration (Doc. 77).

SABIT reports but "pull[s] them as frequently as possible."  The local manager determines which report or group of reports to compile and review.[11]

In July, 2007, Koeberle requested that Mark Dosal, a "performance assurance" specialist, monitor White (1) because "White's performance was . . . not at level gauged with his peers in what we consider the mean average;" (2) because Koeberle "observed Mr. White coming in late at an alarming rate;" and (3) because Koeberle suspected that White failed to "giv[e] Verizon a full day's work."[12]  Dosal routinely "inspect[ed] the work of local managers and technicians."  An inspection of a local manager consists of confirming that the local manager visits his technicians in the field.[13]  For three days, Dosal monitored White.  On each day, Dosal observed White both arriving to work late and leaving work early.  Dosal observed White's riding with Kenneth Prince (a technician not under White's supervision) and, later that day, White's lending his Verizon truck to Prince.  Shortly thereafter (at 3:15 p.m.), White departed the Brandon facility for the day in his personal vehicle.  The following day, White and Prince departed the Brandon facility at 10 a.m. and returned two hours and fifty minutes later.[14]  Dosal reported each observation to Koeberle, who requested Prince's SABIT report.  Prince's SABIT report (1) confirms Dosal's observations and (2) reveals that "Prince was out of

---

[11] Morin Depo. at 23.

[12] Koeberle Depo. at 56-70; Declaration of Marc Dosal ("Dosal Declaration") (Doc. 78).

[13] Dosal Declaration (Doc. 78).

[14] Dosal Declaration (Doc. 78); (Doc. 79-1, Ex. 4).

- 4 -

route and not performing work for several hours and charging time to the company for unproductive time."[15]

Koeberle notified Verizon's human resources department and conducted separate investigatory meetings with White and Prince.[16] In his meeting, Prince confirmed (1) that, on July 14, 2007, for approximately seven hours Prince rode with White in White's truck (leaving Prince's GPS-equipped van at the Brandon facility) and "looked at jobs"; (2) that, on July 16, 2007, Prince and White left work around 3 p.m. and went shopping; and (3) that White and Prince's two-hour and fifty-minute absence was an extended lunch break.[17] (Verizon permits a thirty-minute lunch break.)[18] During White's meeting, Koeberle described both Dosal's observations and Prince's SABIT report; questioned White about his riding with another technician, Clyde Lochin; and discussed White's exceeding the allotted minutes on his Verizon-issued cell phone.[19] White acknowledged arriving at work late, leaving for an extended lunch break with Prince, and exceeding the limit on his cell phone. Koeberle instructed White to discontinue White's interactions with Prince and Lochin.[20]

Koeberle provided his notes from the meetings, Dosal's written observations, and Prince's SABIT report to the director of human resources, Joe Lombrana. Upon

---

[15] Chipman Declaration (Doc. 77).

[16] Koeberle Depo. at 86-88.

[17] (Doc. 79-1)

[18] Koeberle Depo. at 85.

[19] Both a technician and local manager receive a cell phone from Verizon "for use in the field." Declaration of Candace Caldwell ( Doc. 76);(Doc. 79-1, Ex. 4).

[20] White Depo. at 214-20.

receiving and reviewing the information provided by Koeberle, Lombrana states[21] that he:

> had an open discussion with members of my management team, including Kevin Koeberle, relative to allegations that Frederick White had violated company work rules. Specifically, Mr. White reported to work late and left early, on three consecutive workdays (July 16-18, 2007), and engaged in substantial personal activities during the days at issue and on July 19, 2007, with a technician (Prince) whom he did not supervise, for which the hourly employee falsely submitted time records, including charges for overtime. Mr. White failed to meet his obligations as a manager to enforce established work rules and failed to [e]nsure that time records submitted by a technician were accurate records. Mr. White's conduct violated Verizon's Code of Conduct . . . [and] [b]ased on the information presented to me, and the egregiousness of the conduct at issue, I approved the decision to terminate Mr. White's employment.

On August 9, 2007, Koeberle provided White a letter of termination and advised White that Verizon terminated his employment because of his violating Verizon's Code of Conduct.[22] This action ensued.

In this action, White alleges that Verizon and the Union conspired to terminate him based on his race. Specifically, White believes that "there was a conspiracy between [Koeberle] and the [U]nion to terminate someone[] and . . . . [that White] was the one that they decided to target to terminate." White believes that the decision to target him derived from his inexperience, youth, race, lack of tenure, and attempt to initiate an investigation of twenty-five "unproductive" technicians. White bases this belief on a conversation that White overheard between Koeberle and Glye in the "general office" at the Brandon facility and the subsequent, temporally proximate termination of White's, Prince's, and Lochin's employment. White overheard Koeberle

---

[21] (Doc. 81)

[22] Koeberle Depo. at 96.

- 6 -

directing Glye to "bring me somebody." Glye responded by stating that "[e]very time I bring you someone, you let them off the hook." Koeberle and Glye also discussed a technician who "was brought forth for being out of route" and who Koeberle failed to discipline or terminate.[23] White heard no more of the conversation, because Koeberle and Glye exited the general office.

## Discussion

### 1. Disparate Treatment Under Title VII & the FCRA

An employee's establishing a prima facie case of discrimination under Title VII creates a rebuttable presumption that the employer acted illegally. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004).[24] Absent direct evidence of discrimination, an employee establishes a prima facie case by showing (1) that the employee belonged to a protected class, (2) that the employer subjected the employee to an adverse employment action, and (3) that the employer treated the employee differently from a similarly situated, non-minority. 376 F.3d at 1087 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). If the employer articulates a legitimate, non-discriminatory basis for the action, "the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." However, "[t]he employer 'need not persuade the court that it was actually motivated by the proffered

---

[23] White Depo, at 206-10. In response to the motion for summary judgment, White asserts that the conversation derived from "timekeeping issues" and pressure that area managers received to curb employees' "stealing time." However, White heard only part of the conversation, which consists of Koeberle's directive that Glye "bring [him] somebody." See May 21, 2010, Deposition of Charles Darryl Gunn ("Gunn Depo") at 57-59.

[24] An FCRA claim receives the same construction as a Title VII claim. Jones v. United Space Alliance, L.L.C., 494 F.3d 1306, 1310 (11th Cir. 2007).

- 7 -

reasons,'" 376 F.3d at 1087 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981)), and "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Silvera, 244 F.3d at 1258 (quoting Burdine, 450 U.S. at 253)).

### a. White Fails to Establish A Prima Facie Case

In this action, the parties agree that White belongs to a protected class and that White's termination constitutes an "adverse employment action." However, the parties dispute whether Verizon treated a similarly situated, non-African-American employee differently from White. "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects." Holifield, 115 F.3d at 1562. Accordingly:

> [I]n cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule[] or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir.1989); Holifield, 115 F.3d at 1562 (finding that "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."); see Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001) (Carnes, J.) ("In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'") (quoting Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999)).

Therefore, an employee generally qualifies as similarly situated if the employee (1) answered to the same supervisor, (2) worked under the same standards of conduct, and (3) engaged in "the same conduct without such differentiating or mitigating circumstances that would distinguish the[] [employee's] conduct or the employer's treatment of the[] [employee]" as a result of the conduct. Sanguinetti v. United Parcel Serv., Inc., 114 F. Supp. 2d 1313, 1317 (S.D. Fla. 2000) (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) and Patterson v. Wal-Mart Stores, Inc., 1999 WL 1427751, *8 (M.D. Fla. 1999)); Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989) (finding that "disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis."). "'Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently.'" Sanguinetti, 114 F. Supp. 2d at 1317 (quoting Radue v. Kimberly Clark Corp., 219 F.3d 612, 618-19 (7th Cir. 2000)). The failure to show a similarly situated employee warrants summary judgment on a disparate treatment claim. Holifield, 115 F.3d at 1562.

In this action, the plaintiff describes three "comparators" (Dave Phillips, Scott Cassidy, and Michael May) who worked at the Brandon facility, whom Verizon investigated for "timekeeping issues," and whom Verizon purportedly "treated more favorably than [the] [p]laintiff." In 2006 and 2007, each comparator worked in a different division from the plaintiff and answered to a different supervisor, Eric Morin.[25] Morin investigated first comparator, Dave Phillips, after Morin received a report of Phillips's

---

[25] Caldwell Declaration at 10.

personal vehicle parked outside of a bar during work hours. Each day over the course of a week, Morin investigated by driving to the bar during the work day and searching for Phillips's vehicle. Upon failing to find Phillips's vehicle, Morin questioned Phillips directly about the allegation. Phillips denied visiting the bar during work hours and, because Morin "had nothing to substantiate" the allegation, Morin neither continued the investigation nor disciplined Phillips.[26] In 2004, Cassidy worked for Koeberle, who investigated Cassidy based on Cassidy's poor performance and Cassidy's going home instead of going to a job site.[27] Cassidy received discipline but retained his job because the investigation revealed that "[i]t was a one time incident," in which Cassidy became physically ill on the road.[28] As for May, White alleges[29] that he "heard from technicians that [May] was caught sleeping in his vehicle."[30] However, (1) White provides no admissible evidence to support this assertion and (2) May's supervisor Morin deposed that he never investigated May for either "stealing time" or "sleeping in his vehicle on company time."[31]

Thus, two of the comparators worked for a different supervisor in a different division and no comparator engaged in conduct similar (and certainly not "nearly identical") to that of the plaintiff. Rather, each comparator's conduct presents either a distinguishing or a mitigating feature not presented by the plaintiff's conduct.

---

[26] Morin Depo. at 41-43.

[27] Koeberle Depo. at 53-54.

[28] Glye Depo. at 62-63 (Doc. 102-1).

[29] (Doc. 90)

[30] White Depo. at 68-69.

[31] Morin Depo. at 38.

Furthermore, neither situation involves similar evidence of repeated violations for which the comparator received more lenient treatment than White. Thus, the plaintiff fails to show that Verizon treated differently a similarly situated employee and fails to establish a prima facie case for discrimination.

### b. Even if White Established a Prima Facie Case, White Shows No Evidence that His Termination Was a Pretext for Discrimination

White concedes (Doc. 90) that Verizon possessed a legitimate, non-discriminatory reason for terminating White's employment. However, White argues for an inference that the non-discriminatory reason was a pretext for unlawful discrimination based on circumstantial evidence of (1) an alleged physical assault against another African-American local manager; (2) racial hostility at the Brandon facility and prevalent use of the term "boy"; (3) the temporal proximity of the conversation overheard by White and the termination of White's, Lochin's, and Prince's employment; (4) the comparators cited by the plaintiff in attempting to establish a prima facie case; (5) the Equal Employment Opportunity Commission's right-to-sue letter; and (6) the defendant's conduct in disciplining other employees (none of whom are local managers) for "timekeeping issues." However, an employer's non-discriminatory reason "cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false[] and that discrimination was the real reason." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515-16 (1993) (Scalia, J.); see also Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470-71 (11th Cir. 1999); Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987). White presents (1) no evidence supporting the falsity of the non-discriminatory reason and (2) insufficient evidence to support a reasonable inference that Verizon (through Koeberle and Lombrana) terminated White's employment

because of his race.  Use of the term "boy" at the Brandon facility fails (without more) to show that Verizon's terminating White derived from racial animus.  In fact, the evidence shows that the employees at the Brandon facility used "boy" indiscriminately as a casual, neutral, and common replacement for a person's name.[32]  Furthermore, Koeberle's telling White not to associate with two other African-American employees (Prince and Lochin) also under investigation for misconduct provides no evidence of discriminatory motive.  Therefore, summary judgment is warranted as to counts one, two, five, six, seven, and eight.

### *2. Retaliation*

White "concede[s] the claims for retaliation, even though[] [White] has a good faith basis for asserting such claims."  Accordingly, summary judgment is appropriate as to counts three, four, and nine.

### *3. Civil Conspiracy*

Counts ten and eleven of the complaint (Doc. 2) assert a claim based on an alleged civil conspiracy between the Union and Verizon.  Both the Union and Verizon argue for summary judgment (1) because White bases his state law conspiracy claim on his statutory claim and "Florida recognizes no independent tort cause of action for racial discrimination or retaliation"[33] and (2) because White's evidence of a conspiracy, which evidence relies predominantly on the conversation White overheard between Koeberle

---

[32] See supra note 3 and accompanying text. Whether "boy" constitutes evidence of racial animus depends upon the context in which the term appears. Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006).

[33] The defendants argue that the appropriate claim in this action is a claim under 42 U.S.C. § 1985, which creates a cause of action for a conspiracy to violate a person's civil rights.  White asserts no such claim in this action.

and Glye, provides insufficient evidence of a conspiracy. In response, White (1) cites to a November, 9, 2009, order (Doc. 30) that denies the defendants' motions to dismiss the conspiracy claim and (2) provides as additional evidence of a conspiracy the participation of Glye in each of Prince's and Lochin's meetings (despite the availability of other union stewards), Prince's and Lochin's belief that Glye provided insufficient Union representation at the meetings, and Glye's accepting as accurate the evidence of misconduct.

As an initial matter, White's reliance (Doc. 90 and 91, pp. 14-15) on the November 9, 2009, order denying dismissal is misplaced, because the order establishes no fact and renders no finding relevant to White's evidentiary burden on a motion for summary judgment. The order—in accord with the standard of review on a motion to dismiss and for the purpose of evaluating the bare allegations of the complaint—assumes the facts alleged in the complaint and indulges each available inference in the plaintiff's favor. In contrast, on summary judgment the plaintiff receives the benefit of any reasonable inference as to the facts (as established by admissible, supporting evidence). The plaintiff must provide enough evidence to show the existence of a genuine and material issue of fact that prevents summary judgment.

Thus, in response to the defendants' motions, White must provide sufficient evidence to support his civil conspiracy claim, which White fails to do. No reasonable inference of intentional discrimination against White could arise (without more) from the evidence of (1) Glye and Koeberle's conversation; (2) Glye's participating in Prince's and Lochin's meetings with Verizon management; (3) Glye's accepting as true the evidence against Prince and Lochin; (4) Koeberle's instructing White, Lochin, and

Prince not to associate with each other; and (5) the temporal proximity of the terminations.  In fact, the evidence could just as easily support an inference that White, Lochin, and Prince contemporaneously engaged in misconduct warranting discipline and termination.  Accordingly, White fails to show the existence of a genuine issue of material fact preventing summary judgment on the civil conspiracy claim.

## Conclusion

Accordingly, the defendants' motions (Docs. 58 and 60) for summary judgment are **GRANTED**.  The Clerk is directed to (1) enter judgment in favor of the defendants and against the plaintiff, (2) terminate any pending motion, and (3) close the case.

ORDERED in Tampa, Florida, on October 5, 2010.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE